IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 9, 2022 Session

## STATE OF TENNESSEE v. JEFFREY LLOYD LOCKE

Appeal from the Circuit Court for Warren County
No. 19-CR-2238     Larry B. Stanley, Jr., Judge

_____

## No. M2021-01437-CCA-R3-CD
_____

The Defendant, Jeffrey Lloyd Locke, was convicted in the Warren County Circuit Court of felony evading arrest in a motor vehicle and received a three-year sentence to be served as one hundred days in jail followed by supervised probation.  On appeal, the Defendant contends that the evidence is insufficient to support the conviction because the proof does not show that his attempted arrest was lawful and that he is entitled to a new trial due to prosecutorial misconduct during the State's rebuttal closing argument.  Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., AND JILL BARTEE AYERS, JJ., joined.

Kendall Stivers Jones, Assistant Public Defender-Appellate Division (on appeal), Franklin, Tennessee, and John Partin and Rick Stacy (at trial), McMinnville, Tennessee, for the appellant, Jeffrey Lloyd Locke.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Lisa S. Zavogiannis, District Attorney General; and Felicia Walkup, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## <u>FACTS</u>

In May 2019, the Warren County Grand Jury indicted the Defendant for one count of evading arrest in a motor vehicle while creating a risk of death or injury to innocent bystanders, a Class D felony.  The Defendant proceeded to trial in April 2021.

At trial, Lieutenant Paul Springer of the McMinnville Police Department testified that on the night of March 14, 2019, he was on patrol in a marked police car when he learned about a be-on-the-lookout ("BOLO") for a white Ford Ranger pickup truck. The BOLO specifically named the Defendant and said the truck was "probably headed toward the Rock Island area." Lieutenant Springer hoped to find the truck before it left the city limits and "began to pick a path of travel" that would lead him to the vehicle. He ended up traveling "outbound" on Highway 70S, where he encountered a white Ford Ranger. He began following the Ranger and radioed the truck's license plate number to dispatch, which confirmed that the Ranger was registered to the Defendant. Lieutenant Springer activated his blue lights and siren to stop the vehicle. He said that by that time, he and the Ranger were "not that far outside the city limits."

Lieutenant Springer testified that the Ranger's yellow hazard lights began flashing and that the vehicle accelerated. Lieutenant Springer pursued the truck, and their speeds reached more than one hundred miles per hour when the posted speed limit on Highway 70S was fifty-five or sixty miles per hour. Other vehicles also were on the roadway, and one vehicle moved into the emergency lane. Lieutenant Springer said that it was "slightly raining" and that he tried to maintain visual contact with the truck without getting too close to the vehicle. When the truck got to the Rock Island area, it turned left onto Friendship Drive. At that point, Lieutenant Springer had been pursuing the Ranger for more than five minutes.

Lieutenant Springer testified that Friendship Drive was a residential area and that he lost sight of the truck. He began looking for it, and several officers from the highway patrol and the Warren County Sheriff's Department ("WCSD") joined in the search. Lieutenant Springer later received a call that Sergeant Danny Farrell of the WCSD had located the truck behind a home on Friendship Drive, so Lieutenant Springer went to the residence. The Defendant came outside and admitted to driving the vehicle. The white Ford Ranger was parked behind the house, and Lieutenant Springer arrested the Defendant.

Lieutenant Springer acknowledged that his patrol car was equipped with a video camera and that his camera recorded his pursuit of the Defendant. The State played the video for the jury. Lieutenant Springer acknowledged that the date displayed on the video was March 14, 2000, which was the incorrect year.

On cross-examination, Lieutenant Springer acknowledged that he did not have a warrant for the Defendant's arrest when he first encountered the white Ford Ranger. He also acknowledged that the truck's hazard lights began flashing immediately before he activated his patrol car's lights and siren and that he and the Defendant were outside the McMinnville city limits at that time. When the Defendant got to the Rock Island area, he turned off his hazard lights, gave a left turn signal, and turned left onto Friendship Drive.

Lieutenant Springer followed the Defendant but lost sight of the Ranger on Friendship Drive. Lieutenant Springer learned Sergeant Farrell had found the Ranger behind a home on Friendship Drive, and Lieutenant Springer went to the residence. Other officers were present and were waiting for the Defendant to come outside. Lieutenant Springer acknowledged that no charges were ever filed against the Defendant for anything that occurred prior to Lieutenant Springer's initiating the stop.

Sergeant Danny Farrell of the WCSD testified that he was dispatched to assist with Lieutenant Springer's pursuit of the white Ford Ranger but that Lieutenant Springer "advised that he terminated the pursuit because he had lost the vehicle." Sergeant Farrell turned onto Second Street near Friendship Drive and noticed a white Ford Ranger behind a house. The Ranger's parking lights were on, so Sergeant Farrell pulled up behind the vehicle and confirmed that the license tag number on the Ranger matched the license tag number on the Ranger in Lieutenant Springer's pursuit. Sergeant Farrell approached the truck and noticed that the windshield wipers were "still going" and that the ignition was "still on." A woman was staring at him from a window of the house and asked him, "'How can I help you?'" Sergeant Farrell told her that he needed to speak with the driver of the vehicle, and she responded, "'My son has had an accident. He's messed himself. He's in the bathroom. I will have him come out the bottom door, and he will meet you down there.'" Sergeant Farrell "walked down," and the Defendant came outside. Sergeant Farrell asked the Defendant why he did not stop, and the Defendant said he did not see the blue lights. Lieutenant Springer, who had arrived on the scene, arrested the Defendant. At the conclusion of Sergeant Farrell's testimony, the State rested its case-in-chief.

Anita Mayfield testified for the Defendant that she was a deputy clerk for the circuit court clerk's office and that she was responsible for keeping records in the general sessions, circuit, and juvenile courts. At defense counsel's request, Ms. Mayfield searched for records related to any charges filed against the Defendant for incidents that occurred on March 14, 2019. Ms. Mayfield found two general sessions warrants charging the Defendant with evading arrest and reckless endangerment, and defense counsel introduced those warrants into evidence. Ms. Mayfield said that no other charges were filed against the Defendant and that the grand jury later indicted him for only one count of evading arrest.

Lieutenant Springer testified on rebuttal for the State that while he was searching for the Defendant pursuant to the BOLO, a separate investigation involving the Defendant was occurring. That separate investigation related to an incident on Main Street and involved the reason for the BOLO. Lieutenant Springer did not participate in that investigation, and his only in involvement in that case was to try to intercept the Defendant's Ranger. On cross-examination, Lieutenant Springer testified that he did not know what happened on Main Street.

At the conclusion of Lieutenant Springer's testimony, the State rested its case. During defense counsel's closing argument, he asserted that the Defendant's attempted arrest was unlawful because Lieutenant Springer activated his blue lights "just outside" the McMinnville city limits and because Lieutenant Springer did not have probable cause to believe that the Defendant had committed an offense. Defense counsel then read to the jury the eleven situations set forth in Tennessee Code Annotated section 40-7-103(a) in which an officer can arrest a person without a warrant and argued that none of them applied in this case. During the State's rebuttal closing argument, the prosecutor responded to defense counsel's arguments by reading aloud Tennessee Code Annotated section 6-54-301, which extends "[t]he police authority of all incorporated towns and cities" one mile beyond "the lawful corporate limits thereof," and by asserting that the Defendant's arrest was lawful because an ongoing investigation of the Defendant was occurring when Lieutenant Springer activated his blue lights.

During jury deliberations, the jury sent out a note asking, "'Officer did not have a warrant. So we need to know why by law he was following him and doing a stop.'" The trial court sent back a written response, stating, "'The facts are to be determined by you according to what you heard and believe during the trial. I cannot expound on the facts or someone's reasoning.'" Shortly thereafter, the jury sent out a second note, asking, "'Can we get a copy of the exceptions presented by the closing statement of the defendant pulling over without a warrant?'" The trial court sent back a second written response, stating, "'Both parties talked about other Tennessee laws during closing arguments. You may consider them, but I cannot give you a copy of them because they were not introduced into evidence.'" About ten minutes later, the jury returned to the courtroom and found the Defendant guilty as charged in the indictment of evading arrest in a motor vehicle while creating a risk of death or injury to innocent bystanders, a Class D felony. After a sentencing hearing, he received a three-year sentence to be served as one hundred days in jail followed by supervised probation.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant claims that the evidence is insufficient to support his conviction because no rational trier of fact could have concluded that his attempted arrest was lawful. In support of his claim, he notes that the jury did not hear any proof as to why the BOLO was broadcast, how much time elapsed between the BOLO and Lieutenant Springer's encountering the white Ford Ranger, and whether Lieutenant Springer even had jurisdiction for the stop because the officer was outside the city limits when he activated his blue lights. The State argues that the evidence is sufficient. We agree with the State.

- 4 -

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *See State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

As charged in this case, Class D felony evading arrest occurs when any person, while operating a motor vehicle on any street, road, alley, or highway in this state, intentionally flees or attempts to elude any law enforcement officer, after having received any signal from the officer to stop the vehicle, and the flight or attempt to elude creates a risk of death or injury to innocent bystanders, pursuing law enforcement officers, or other third parties. Tenn. Code Ann. § 39-16-603(b)(1), (d)(2)(A). It is a statutory defense to prosecution for felony evading arrest that the attempted arrest was unlawful. Tenn. Code Ann. § 39-16-603(b)(2). When a general defense is fairly raised by the proof, the trial court must submit the defense to the jury, and the burden shifts to the State to prove beyond a reasonable doubt that the defense does not apply. *State v. Perrier*, 536 S.W.3d 388, 403 (Tenn. 2017). In this case, the trial court instructed the jury that an unlawful arrest was a statutory defense to the charge of evading arrest.

"Generally, challenges to the constitutional validity of a stop, based upon a lack of probable cause or reasonable suspicion, are made prior to trial by a motion to suppress."

- 5 -

*State v. Darrin Bonner*, No. W2007-02409-CCA-R3-CD, 2009 WL 1905420, at *6 (Tenn. Crim. App. July 2, 2009) (citing Tenn. R. Crim. P. 12(b)(2)).  The Defendant did not file such a motion in this case and is relying entirely upon the statutory defense provided by Tennessee Code Annotated section 39-16-603(b)(2).  *See id.*

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals against unreasonable searches and seizures.  *See* U.S. Const. amend. IV; Tenn. Const. art. I, § 7.  "These constitutional provisions are designed to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'"  *State v. Keith*, 978 S.W.2d 861, 865 (Tenn. 1998) (quoting *Camara v. Municipal Court*, 387 U.S. 523 (1967)).  A search or seizure conducted without a warrant is presumed unreasonable, and evidence obtained as a result will be suppressed "unless the prosecution demonstrates by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement."  *Id.* (citations omitted).

An exception to the warrant requirement exists when an officer has either probable cause or reasonable suspicion supported by specific and articulable facts that a criminal offense has been or is about to be committed.  *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *State v. Binette*, 33 S.W.3d 215, 219 (Tenn. 2000).  "Whether probable cause is present depends upon whether the facts and circumstances and reliable information known to the police officer at the time of the arrest 'were sufficient to warrant a prudent man in believing that the [individual] had committed an offense.'"  *State v. Downey*, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).  "Reasonable suspicion" for a detention, which is less demanding than probable cause, is "a particularized and objective basis for suspecting the subject of a stop of criminal activity."  *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000) (citing *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).  "The specific and articulable facts must be judged by an objective standard, not the subjective beliefs of the officer making the stop."  *State v. Norword*, 938 S.W.2d 23, 25 (Tenn. Crim. App. 1996) (citing *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).

The Defendant asserts that the facts in this case are "almost identical" to the facts in *State v. Roy Ernest Russell*, No. E2006-00410-CCA-R3-CD, 2007 WL 1559247 (Tenn. Crim. App. May 31, 2007).  In that case, the defendant pled guilty to driving under the influence, fourth offense, but reserved a certified question of law as to whether his traffic stop was lawful.  *Roy Ernest Russell*, 2007 WL 1559247, at *1.  At the defendant's suppression hearing, the arresting officer testified that he received a BOLO for the defendant's truck about 6:25 p.m.  *Id.*  Minutes later, the officer observed the truck, stopped the defendant, and arrested him for driving while intoxicated.  *Id.*  About two and one-half hours prior to the issuance of the BOLO, the same officer had responded to a call at a residence and had talked with witnesses who claimed to have seen the defendant possibly

- 6 -

driving intoxicated at 10:30 a.m. *Id.* In determining whether the officer had reasonable suspicion to stop the defendant, this court stated that the BOLO was of "no value" in this court's analysis because the officer's testimony was "devoid of any information regarding the nature of the BOLO, the complaint behind the BOLO, the complaining party, or the location of the residence in relationship to the defendant's location." *Id.* at *2. This court also stated that the information the officer received about the defendant driving under the influence at 10:30 a.m. was "stale" by the time the officer stopped and arrested the defendant eight hours later. *Id.* Therefore, this court concluded that the officer did not have reasonable suspicion for the stop, reversed the defendant's conviction, and dismissed his case. *Id.*

The State claims that this case is distinguishable from *Roy Ernest Russell* because the issue in this case is sufficiency of the evidence, which employs a different standard of review than suppression of the evidence, and because the facts of this case are "markedly different" from the facts in *Roy Ernest Russell*. While we think this court's analysis in *Roy Ernest Russell* is helpful to our review of the sufficiency issue in this case, we agree with the State that the facts in this case are distinguishable.

Unlike the arresting officer in *Roy Ernest Russell*, Lieutenant Springer testified on direct examination that the BOLO included a description of the vehicle, the Defendant's name, and the direction in which the vehicle was traveling. Lieutenant Springer said that he went to the area where he thought he might encounter the vehicle and that he spotted a vehicle that matched the description of the vehicle in the BOLO. He then verified with dispatch that the tag number on the vehicle he was following matched the tag number on the vehicle in the BOLO. In his rebuttal testimony, Lieutenant Springer acknowledged that the BOLO related to an investigation on Main Street involving the Defendant and that the investigation was occurring while Lieutenant Springer was looking for the vehicle. Although Lieutenant Springer did not testify about the specific reason for the BOLO or the amount of time that elapsed between the issuance of the BOLO and his seeing the vehicle on Highway 70S, the Defendant introduced into evidence the general sessions warrants issued in this case, which included Lieutenant Springer's affidavits of complaint. According to those affidavits, the BOLO related to a "physical domestic" that had occurred at Beersheba Towers about 8:53 p.m. The video from Lieutenant Springer's patrol car, which the State played for the jury, showed that he turned on his emergency equipment to stop the Defendant just eleven minutes later at 9:04 p.m.

Moreover, Lieutenant Springer testified that "the onset of my blue lights happened somewhere . . . in between the city limits and VFW that's Wild Bill's now. So not that far outside the city limits." On cross-examination, defense counsel replayed the video from Lieutenant Springer's patrol car, and Lieutenant Springer pointed out the approximate location in the video where the city limits ended. The video showed that shortly thereafter,

Lieutenant Springer turned on his blue lights. Thus, we conclude that a reasonable jury could have determined that the officer had reasonable suspicion and jurisdiction to stop the Defendant and, therefore, that the jury could have rejected his statutory defense. Accordingly, the evidence is sufficient to support his conviction of felony evading arrest.

## II. State's Improper Closing Arguments

The Defendant claims that he is entitled to a new trial because the prosecutor made an improper "golden rule argument" during the State's rebuttal closing argument. The State argues that the Defendant is not entitled to relief. We agree with the State.

During the prosecutor's rebuttal closing argument, she stated, "I asked you folks in jury selection if any of you traveled in front of the mall area out Highway 70 towards Rock Island. Every single one of you raised your hand. You've traveled that road. So this should be important to you." Defense counsel objected and stated, "That's Golden Rule argument. That's very inappropriate." The trial court sustained the objection and told the jury, "Please disregard the last statement."

It is well-established that closing argument is an important tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments. *See State v. Carruthers*, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

In *Goltz*, this court outlined "five general areas of prosecutorial misconduct" that can occur during closing argument: (1) intentionally misleading or misstating the evidence; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge. *Id.* at 6.

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." *State v. Pulliam*, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). This court has listed the following factors to be considered when determining whether the improper argument of a prosecutor affected the verdict to the prejudice of the defendant:

- 8 -

1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.

2. The curative measures undertaken by the court and the prosecution.

3. The intent of the prosecutor in making the improper statement.

4. The cumulative effect of the improper conduct and any other errors in the record.

5. The relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

The "golden rule argument" suggests to jurors that they place themselves in the position of the defendant or the victim. *See Ashdji v. Yardley*, No. 1188, 1988 WL 116498, at *2 (Tenn. Ct. App. Nov. 4, 1988). Such argument is "usually improper, and reversibly erroneous." *Id.* The Defendant contends that the prosecutor's comment that "this should be important to you" violated the golden rule argument because it implied that the jurors had a duty, as fellow drivers on Highway 70S, to ensure that reckless drivers were brought to justice and to make the road a safer place. The Defendant asserts that the improper comment must have swayed the jury to find him guilty because the jury's two notes demonstrate that the jurors could not determine whether his attempted arrest was lawful.

The Defendant's claim that the prosecutor's statement led the jury to convict him is pure speculation. We conclude the evidence was more than sufficient for the jury to find that the Defendant's attempted arrest was lawful. In any event, applying the *Judge* factors, the prosecutor did not specifically ask the jurors to place themselves in the position of the Defendant or any innocent bystanders. Defense counsel promptly objected, the trial court sustained the objection, and the trial court instructed the jury to disregard the statement. We generally presume that the jury follows the instructions of the trial court. *See State v. Butler*, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). Additionally, nothing indicates malicious intent by the prosecutor, we have not found any other errors in the record, and the State's case against the Defendant was strong. Therefore, we agree with the State that the Defendant is not entitled to relief on this issue.

## CONCLUSION

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

_____
JOHN W. CAMPBELL, SR., JUDGE